The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to give their God save the United States and the Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Good morning. Well, good afternoon. We're happy to have you with us and we're happy to hear argument in our first case, number 1944-96, United States v. Bartow. Counsel, whenever you're ready. Thank you and good afternoon, Your Honor, and may it please the Court. Lieutenant Colonel Bartow was convicted under Virginia's abusive language statute for posing a series of rhetorical questions during an argument that mostly took place while Lieutenant Colonel Bartow was on his knees trying on boots. His conviction is contrary to both Virginia law and the First Amendment of the United States Constitution and as such should be overturned for at least three related reasons. First, Lieutenant Colonel Bartow's mode of expression was rhetorical questioning and therefore constituted protected speech and not fighting words. Punishing his rhetorical speech because he used an offensive word while posing his rhetorical questions is an unconstitutional viewpoint-based restriction on his speech and does not fall within the limited fighting words exception. Like a self-styled modern-day Socrates, he sought to challenge generally accepted norms through a series of rhetorical questions. At trial, the magistrate judge- Counsel, if I could interrupt you. Yes, Your Honor. That's a generous description of your client, but I won't go there. Before you talk about the merits, I'd like to understand what's the proper standard by which we review this appeal. I think your colleagues suggest we should defer to factual findings, and I think you've argued to the contrary. I think it's important for us to understand exactly what our standard of review is. Can you address that first, please? Yes, Your Honor, and we would agree that there are some factual findings that you would apply a deferential standard of review towards. For example, what Lieutenant Colonel Bartow said, that he gestured, who he directed his words to. At trial, the magistrate judge found that he had directed the N-word towards one specific gentleman. I think that's a finding of fact, and I think a deferential standard is appropriate there. However, Your Honor, there's also a category of mixed questions of fact and law, and under Bose, those are more appropriately reviewed de novo. Those questions include both- whenever there's a question of the legal effect of what he said, was the speech protected or was it not? That is a classic mixed question of fact and law, and that's entitled to de novo review, Your Honor. I don't think Bose makes the distinction between mixed questions of fact and law and non-mixed questions of fact and law. It does say that some are, even though they're facts, you need judicial evaluation of them, because they've been deemed to have constitutional significance. So I'm not so sure where that is, but I'm not sure it divides between mixed questions of fact and law and just facts. It seems to color facts, special facts that have been deemed to have constitutional significance. That's what the Supreme Court said. Yes, Your Honor, I would agree with that. In a Justice O'Connor concurrence, she pointed to whether or not words were fighting words is a classic example of that, though I grant you that that's somewhat vague guidance. And at trial, the magistrate judge characterized some of Lieutenant Colonel Bartow's speech as bizarre. OK, I have a question about your opening layout there. You categorize all this as as merely rhetorical questions by a modern day Socrates. Is it the case then that as long as you frame whatever you're saying in the form of a question, it can never amount to fighting words? Your Honor, we would not take that position. I think we we would concede that you could frame a rhetorical question where it had no value other than to be directly insulting or abusive to the person to whom it's addressed. So, for example, Your Honor, if I was speaking to somebody and I said, what are you, some sort of idiot? Then there's no there's no other expressive value. Do you think idiot is less of a fighting word than the N-word? Well, Your Honor, I think the the specific word I chose was less a point than the direct insult. But no, I do not. I think in fact, in this case, I think the offensiveness of the N-word was central to the point that Lieutenant Colonel Bartow was trying to convey, which was that to him, the use of sir and ma'am, which are. Yes, but he I understand your argument about the sir and the ma'am, but he can't. It appears that he came in there almost looking for a fight because he didn't bring up the thing about the sir or ma'am until his second salvo in response to good morning. He went off with a rhetorical question. That's right, Your Honor. He he's certainly an expressive individual. I don't think he was trying to pick a fight in that trial. The magistrate judge characterized that rhetorical question, which the testimony was a little bit uncertain on the exact words, but I think it was. What about the fact that he wasn't? I mean, we can looking at everything that happened here. I know you said that he was for the most part sitting down trying on boots, but he he wasn't always sitting down trying on boots. He stood up. He pointed at people. He got aggressive and close with other the other people in the store. What about that? Well, Your Honor, a few points. I think, first of all, using gestures, being animated is completely acceptable. And we would concede that it was a heated conversation. In fact, he did believe that he was being harassed. And I think the video record shows, Your Honor, that the the white male lieutenant colonel who was the first intervener in the conversation, his body language was much more animated, much more threatening than anything that Lieutenant Colonel Bartow ever did. What counsel, what would give me an example of what would constitute fighting words in your view? Your Honor, in footnote two of our reply brief, we cited a number of examples from the cases the government cited. I think and you take the position that those are in that footnote. Those are appropriate examples of fighting words. Yes, Your Honor. This is not a facial challenge to the statute as limited by Mercer v. Winston, which is the Virginia Supreme Court case that held that the. The statute is limited to words that have the direct tendency to cause acts of violence by a person to whom individually the remark has been addressed. So, Your Honor, to point to a case Cohen v. California, the case with the jacket that said, fuck the draft. Right. That that would not be a fighting word. But if you were in the middle of a heated conversation to point your finger at somebody and say, fuck you with no with no other rhetorical point, no other rhetorical intent, then I think that could perhaps be found by a jury or by a judge trial to be to be a fighting word. Your Honor. But all those examples in footnote two in your reply brief include the N word. I'm confused. Yes, Your Honor. And certainly we wouldn't say that there's never a context where the N word could be a fighting word. Well, the presence of the N word is what makes this case complicated, right? I agree. I doubt there would be a an attempt to find a crime had been committed. So you have to deal with that. I agree. I agree with you, Your Honor. And I think there's no question that the N word was offensive in that context, even though I think Lieutenant Colonel Bartow did not intend for it to be understood offensively. He was his intent was conveying how offensive he found the word sir to be. So to say that something is analogous is not to offend. The government says, let me ask you if you agree with this. The key question becomes whether the N word was specifically directed at an individual in circumstances where violence could result and was likely to do so. Would you agree with that? That's the key question of the case. Your Honor, I would. I would not agree with that. All right. What do you disagree with? So, first of all, I, I think that it's important to go back to the mattress. It's finding that the word was directed at the second intervener. No, no, no, no. My question, I guess, has not been clear. The key question here, not the question, not that it's been resolved against the key question is whether the N word was specifically directed in an individual. In circumstances where violence could result and was likely to do so. That's a question that has to be resolved. Your Honor, I would agree with that, except I would add that the N word would have to be used in a way that was intended to be insulting or abusive and not in a way that was intending to convey a. A non-fighting words express. Well, it seems to me that's such a big. Tell me an example where it would be specifically directed at an individual in circumstances where violence could result and was likely to do so. It would not be regarded as fighting with. Your Honor, I think that. To take an example, perhaps of a of a white rapper. Who use the N word as part of a song and use it now, he has to specifically directed at an individual. Circumstances where violence could result and was likely to do so. Yes, Your Honor, but I think if the intent there is not is not to insult, but is to. Make a protected point, then even if it could serve the audience or could serve the person that's being directed at to violence, it's still protected speech. Your Honor, I don't get where you come up with his intent matters. Don't the words speak for themselves, so to speak. So, Your Honor, I do think that the offensive nature of the word speaks for itself. Yes. But I to to address Judge Thacker's question, whether whether intent matters, I think there's a few points. First, I would point to the Supreme Court's decision and Alana's where they determined that if you could speak up a little bit, please. I'm having trouble hearing you. Yes. Yes, Your Honor. I'm sorry about that. First, OK, you you were about to point to Alana's and Alana's said itself that it doesn't. It's not necessary in that case to consider any First Amendment issue. So Alana's didn't consider the First Amendment. So what's your next point? Your Honor, I would I still think that as a basic principle of criminal law, that one has to intend the wrongful conduct. And here what makes the use of any word wrongful is the offensive, the direct insult or abuse that could result in violence. But second, Your Honor, I think that there's a distinction between fighting words and threats where subversive speech is inherently likely to cause a violent reaction in an audience. If somebody is making an unpopular point, they might. And in this case, I think there's no question that Lieutenant Colonel Bartow is making an unpopular point. They might serve their audience. They might serve the person they're talking to to violence. But unless that is their intent, it has to be protected speech, Your Honor. Otherwise. Otherwise, well, in the Supreme Court case of Chablisky and Johnson, that the inquiry is objective, not subjective. Subjective intent doesn't matter. And the Virginia Supreme Court said the same in Mercer. Your Honor, I think in those cases, there was no question what the speaker's intent was. And Chablisky where he said, you're a you're a goddamn racketeer and a fascist. He's directing the speech towards the addressee. And there's no there's no other rhetorical point being made other than to insult and to abuse the target of the speech. But counsel, you're I mean, and maybe I'm just belaboring what what Judge Motz and Judge Thacker have said. I mean, we don't have tons of law on this, but I don't think any Chablisky, Cohen, R.A.V., all the handful of cases we have. You talk about it being likely to incite the average person to breach the peace. It seems to me like you're adding an additional inquiry we need to make about what was in the mind of the speaker at the time. And I don't recall seeing that in any of those cases. Well, Your Honor, I don't think it was in any of those cases. And all those cases was was unambiguous. And I don't think the government has pointed to any cases where there is this question of whether somebody is being punished for rhetorical speech or whether it's simply to assault to abuse, degrade, insult to such a degree that it's likely to lead to violence. All right. I guess your time is expired. Perhaps you reserve some time for rebuttal. Yes, Your Honor, if I could reserve my remaining time. Thank you. So we'll hear from the other side now. Good afternoon, Your Honors. May it please the court. For almost 80 years, the Supreme Court's decision in Chablisky stood for the proposition that someone cannot escalate a confrontation using abusive language to the very threshold of violence and escape potential prosecution for breach of the peace. To paraphrase the district court, this defendant used a racial slur laden with historical invective as the final thrust in a vulgar and heated confrontation. His prosecution for that wrongdoing was constitutional. Is that single word sufficient to to incite a fight to to be fighting words? No, Your Honor. When does it cross the line? It's always a totality analysis. And the cases in this area always look to both the circumstances and whether or not the slur or word itself is abusive. Here, I don't take my friend on the other side to contest that the slur constitutes abusive language. So then that leads to the circumstances. And as I parse out the record, Judge Motz, there are seven circumstances here that support the magistrate judge's factual finding. First, the defendant opens this interaction with Miss Johnson Felder with aggressive, vulgar questions. Second, well, I think that that's not so clear. They're very odd questions. It seems like this guy has some mental problems or at least a very odd personality. I understand, Your Honor. I do think the second factor here is the magistrate judge made a factual finding. We think supportably that the gestures here were threatening, included hands on his hips, followed by pointing at the store clerk directly from only a few feet away. There's volume. Miss Johnson, do you really think that the threatening to Miss Johnson Felder or threatening to anybody? I mean, I mean, I've watched that videotape a number of times, as I'm sure you have. But and, you know, and lots of it repulses me. But I have a little concern that you're saying putting hands on your hips and doing the hand gestures he did creates a threat. I mean, quite frankly, I'm I better not go home at night because I get that a lot at my house. And I don't think that's I've never took it, taken it that way. I totally understand, Judge Quattlebaum. And I want to be really clear. My argument is not that any of the things I'm trying to tick through in isolation would suffice my argument. And perhaps this goes to your initial question, Your Honor. You asked about the standard of review. So, yes, sir. In our view, because we think this is simultaneously an as-applied challenge and in effect a Rule 29 challenge, because the Virginia Supreme Court in Mercer collapsed the statute to a Chaplinsky inquiry, we think that the standard of review here is deferential twice over. There's clear error review of the magistrate judge's factual findings. And there's the additional fact that under Rule 29, we draw all reasonable inferences in favor of the magistrate court's judgment. And so to be clear, when I am ticking through these factors, I affirmatively am disclaiming that any of them in isolation are enough. What I am trying to do is saying that in a Rule 29 posture where the question is, did the magistrate judge clearly err in concluding that this language was abusive and not rhetorical and directed at both Ms. Johnson Felder and the African-American civilian bystander? Is that in any way clear error? And our assertion is no. Well, having said all that, do you think that standard of review is any different than what the Supreme Court said in Bose? I do not, Your Honor. I think the Bose standard is perfectly fine. But I would point out- We must conduct an independent examination of the allegedly unprotected material. I agree with that. That's what we're supposed to do. An independent examination. But I would say, Judge Motz, that there's a paragraph that caught my eye as I was rereading Bose that I think is helpful here, which is there's a section where the Supreme Court says, to the extent that there is clear error review of factual finding, that bears on that de novo analysis, oral testimony receives even more deference than documentary evidence. And I think here that matters. One of the salient features of this record is that the only evidence about this slur came from the testimony of Ms. Johnson Felder. She testified to it three times at JA 18, 23, and 33. And I think it is reasonable to believe that when she said what the defendant said to her and the African-American civilian, she might have did so with a tone and a timbre and an emphasis that Magistrate Judge Buchanan heard and that very well have borne on her conclusion that what happened here was abusive and not rhetorical. Do you have a transcript? Did you hear her tone of her voice? No, I'm saying that when there's clear error review attendant to oral testimony, it is especially deferential. That's the only thing I'm saying, Your Honor. Counsel, I'm sorry. Go ahead, Judge Thacker. No, no. So, Counsel, as I understand what we're trying to look at is whether the average person would be incited to retaliate in a way that breaches the peace. And I realize it's not how any one individual would react as we look at that. But does it matter at all that none of the people in the vicinity here retaliated in a way that breached the peace? Does that matter at all? My answer, Your Honor, is that while I think it is some evidence in the defendant's favor, it is not dispositive and it's not a complete defense, just as on the other side. No, but it is. There are half a dozen people. That was going to be my question, too. None of them seem to react at all. That's correct. Although I think on the other side of the spectrum. Well, how soon did the security guard show up? Judge Thacker, my reading of the video, we know that the slur is used between the time the uniformed captain and the African-American civilian arrive on the scene and the time Miss Vicki Helder arrived on the scene as the security guard. My reading is that that is between three minutes and three and a half minutes into the interaction. So fairly soon in the eight minute video. Yeah, but enough time for people to be alarmed and scared. That's correct. And Judge Mott, it's actually to your point about how nobody sort of on the video seems to visibly react. I would say two things. Actually, it was Judge Quaylebaum's point, but go ahead. I would say two things. One is Miss Johnson Felder was very clear that the use of the slur is what prompted her to call for security. So she believed that that slur escalated the situation to the point where she wanted intervention. But is that. But that is that. Let me just think, because I think the test is whether it would incite the recipient of the speech to retaliate in a way that would breach the peace. So I'm having trouble how you are saying that her response, which is admirable, is consistent with the standard you have to meet. I mean, what what here's someone who is no doubt insulted as well. She should be. And rather than go up and slapping, which might have been understandable to she called security. I mean, how does that help you? Let me try to do this in a sentence, Judge Quaylebaum. I think what people did in the room at the time, up to and potentially even after the slur is used, is relevant to the totality analysis of whether or not the Mercer-Czaplinski test is satisfied. But at the same time, just because nobody hauled off and punched the defendant in the face, that is not a complete defense under Czaplinski. Because as the court was saying a moment ago, it is an objective standard. I'm just saying it's relevant and it's relevant on both sides. I'm not saying that it's dispositive here. And is she required to actually respond and rise to the incitement in order for it to be fighting words? I mean, she was in a situation where it could have been dangerous. This person did seem to have some challenges, the appellant, I mean. So it could have been dangerous for her to rise to that occasion in any way other than she did. I agree. There's absolutely no requirement that any of the people here had to rise to the level. You had seven, Mr. Young, you had, I think you said you had seven points you wanted to make in the totality of the circumstances. And I heard maybe two. I'd like to, if you could quickly do it, maybe run through the seven. Absolutely. One, aggressive vocal questions. Two, threatening gestures as found by the magistrate judge. Three, volume. Ms. Johnson Felder said that he raised his voice, was yelling, and everyone heard him. Four, the fact that his conduct drew a crowd, including the lieutenant colonel, who himself escalated the situation by stepping towards him and putting his finger in his face. Five, the defendant's rejection of de-escalation efforts. When the African-American civilian and the uniformed captain arrive on the scene, they both try to calm things down, and the defendant's words are, I'm not going anywhere. Six, the fact that, and this goes back to my dialogue with Judge Quattlebaum about it's evidence, but it's not just positive. The fact that immediately upon hearing the slur, Ms. Johnson Felder went for security because she believed security's intervention was necessary. And then seven, I do think it's relevant that the tension level remains high even after the slur is used. Because I think it is evidence of what was happening at the moment the slur was used. So I think it's relevant that a few minutes later, the lieutenant colonel has to be physically separated by the security guard from the defendant. I appreciate how quickly you did that. Tick through the seven. What about the fact in terms of the totality of the circumstances that he did continue to try on the boots? He was sitting down some of the time, standing up some of the time, but he continued to carry on his business trying on the boots. What about that? I think it's relevant, but I don't think it leads to the conclusion that the magistrate court committed clear error. And I would phrase this in terms of Chaplinsky itself. So Chaplinsky favorably quotes the New Hampshire State Court, which said, look, if Chaplinsky had said racketeer and fascist, but he had done so with a disarming smile, no constitutionally permissible prosecution. So on our view, if at some point Mr. Bartow had sort of disengaged, stepped back, lowered the temperature and said, I am not trying to provoke a confrontation. I simply have a political view. That would be 100 percent constitutionally protected. But on our reading of the record, Judge Thacker, even as he is on one knee trying on his boots. I mean, that's the posture in which he uses the slur, which the magistrate court was concluded was directed at both the civilian and at Miss Johnson Felder, simultaneously in an abusive fashion. But don't we have to determine whether a reasonable person would react with violence to the person ranting in a school, in a shoe store, on a Marine base? Isn't isn't that part of our determination here? And it's just none of those things. We have the tape. We don't have to listen to somebody's characterization. Isn't that our position, no matter what this what findings were made? That is entrusted to us. I agree that it is a totality analysis and I agree that the setting is relevant. All the cases say the setting is relevant. I suppose we're ultimately looking to see if a reasonable person would react with violence. I agree. I agree. And the government submission in the district court on the first round of appeal, and this appears at JA 123, was that any of these three people could have been provoked to breach the peace. And I would tie this answer to the text of the Virginia statute, because we actually charged two different prongs in the criminal information. One prong is about cursing or abusing someone under circumstances reasonably calculated to provoke a breach of the peace. I think in light of the magistrate judge's findings, we satisfy that as to the African-American civilian, antimist Johnson Felder. The last prong is using violent, abusive language under circumstances reasonably calculated to provoke a breach of the peace. And as we argue to the district court, I think that applies to the lieutenant colonel. The lieutenant colonel intervened here to protect the African-American store clerk from an increasingly hostile and potentially violent situation. And by deploying the slur in the way that he did, defended in effect sabotaged the lieutenant colonel's efforts to de-escalate the situation and protect the victim. And on those facts, we think it's also reasonable to believe that he might have reacted with violence given all the circumstances. But counsel, you keep using like he might have or he could have. And I grant you that all day long. But what you're required to show is that it is likely, which is more probable than not, that someone will breach the peace, which is another way of saying break the law. So it seems to me that's a pretty high standard. And I guess it is because we're talking about the First Amendment. And so when you kind of, in your responses, lower the standard, probably not intentionally. I know this is, you know, I don't mean to play gotcha with that, but use words like could or might. I think that's not what we're supposed to be looking at. Judge Quattlebaum, you are 100 percent correct. And I apologize for the imprecision. I think the question is, in light of all the circumstances, could the defendant's face-to-face abusive and insulting language likely provoke violent reaction or retaliation from any of the three people I mentioned? I'm quoting that directly from Mercer. That is correct. That is the question. I agree completely. Do you have anything further? I suppose, Your Honor, I would simply end here. You don't have to. I had a colleague when I first took the court, who would always say, you don't have to use all your time. I said, I don't care what they need. Understood. I suppose I would just end here. The Mercer inquiry that we just discussed is always going to hinge on a conjunction of the circumstances and the actual abusive language that is used. And I think it is appropriate to end with Judge Ellis's observations, which are in conformity with then Judge Kavanaugh's observations on the D.C. Circuit. This word carries more invective force than practically any other word in the English language. In R.A.V., Justice Scalia analogizes the fighting words doctrine to running an overly loud loudspeaker truck, which is why it's not content-based. It's a form of emotive expression. This word cranks up the volume to 11 and took a dicey situation and converted it to one where satisfying Mercer, it was reasonably likely that violence could have ensued. And for that reason, we asked the court to affirm the judgment. Thank you. Thank you, Your Honor. Thank you, Your Honor. I'd like to say a few things in response. First, we are not contesting the record, what is in the testimony. So while I agree that there are circumstances where in-person testimony is entitled to greater weight, we're not contesting what was said. And in fact, I would point to JA18 where Ms. Felder is describing the situation leading up to Lieutenant Colonel Bartow's use of the N-word. She says, then another African-American gentleman came into the picture and in a convoy is trying to say, sir, the reason that she said sir or ma'am is because you are purchasing merchandise at a military installation. And there is a common courtesy, associates say sir or ma'am to their customers. And then at that moment, he responds by saying, if I called her an N-word, would she still say good morning? And, Your Honor, I think that exchange is the key to understanding what he was saying. And I think it's also the key to understanding that this didn't escalate the situation. This was meant to try to put into his words to communicate just how strongly he felt. And, Your Honor, I would submit that there is no First Amendment requirement that a speaker not be offensive or that a speaker be effective in communicating or conveying their message. He was struggling to convey just how strongly he felt about the word. And that leads me to the next point I'd want to make, which is that, well, the magistrate judge found that his speech generally was directed at a number of different people. At the top of JA-52, she found that the N-word specifically was directed at that gentleman, that African-American intervener, and not at Ms. Paulder. But what Mercer requires, Your Honor, Your Honors, is that the statute be limited towards having the direct tendency to cause acts of violence by a person to whom individually their remark has been addressed. So I completely disagree with the government that the, for example, the white lieutenant colonel's clear anger in the video is relevant to the inquiry here. And I think the question that was not answered at trial is not whether any of the bystanders would have been justified in throwing a punch after he said that, but whether the specific gentleman to whom he directed his words would have been justified or would have been reasonably likely to respond with violence. I'm sorry, and I missed that. To whom do you think he directed these words? And I meant to ask your colleague that. I think the testimony at the bottom of JA-18 and the top of JA-19 makes it clear that the word is being directed in response to a question from the African-American intervener, who's trying to explain why she was using the words sir and ma'am. So even at the point where the second intervener comes into the picture, it's clear that that's what he's upset about. I actually disagree that there's any confusion. He is perhaps ranting, but he is ranting about being addressed as sir. But I mean, he did get upset at good morning. Yes, Your Honor, I think he got... Any of his speech in that context would have come close to falling within the fighting words exception, Your Honor. Barring any further questions, Your Honors, I would say that speech is protected and does not fall within the narrow fighting words exception to the First Amendment, unless it is intended to abuse, degrade or insult the person to whom it is directed and a reasonable person standing in that person's shoes would be likely to respond with violence. And Your Honor, given the record, given the facts here, the evidence wasn't sufficient to show that. And in fact, the evidence was sufficient to show that he was engaging in constitutionally protected speech. Therefore, his conviction cannot stand. So just let me give you a hypothetical. You are in a room full of African-Americans and there are two or three white people. And one of them says to the other, you're just a no good N-word. No fighting words, right? Well, Your Honor, I don't know that there is expressive value there, but I think that that's terminal. That's making an unpopular point to perhaps a room where there is some potential for violence. My point was it wasn't directed at the African-Americans. It's directed at a white person. And I thought that in and of itself you were suggesting meant that it couldn't be fighting words. Well, Your Honor, I think it would it would depend on how the word was being used to the white person. I don't think that you could never find that the N-word directed at a white person was a fighting word. But without more than I would agree. OK, you're as bad as the N-word. Your Honor. I mean, I don't understand what you're saying. You give me an example where it would and wouldn't be then. Fighting words if directed at a white person. Where it would be, Your Honor? Where it would be and where it would not be. Yes, Your Honor. In the context of, say, those two white people are having a heated dispute and the person says there's plenty of language in the cases they have on sites. You're you're just a F-ing N-word. Then that perhaps could be an example of a fighting word. But it would depend on the addressees reasonable reaction and not on the the crowds. Even if people were more likely to overhear that exchange. Thank you very much. We will take the case under advisement. And go directly to our next case. Thank you, Your Honors.
judges: Diana Gribbon Motz, Stephanie D. Thacker, A. Marvin Quattlebaum Jr.